UNITED STATES, Appellee

v

ANGUS T. HURT, Specialist Five, U. S. Army, Appellant

19 USCMA 206, 41 CMR 206

No. 22,340

February 6, 1970

*Captain Paul C. Saunders* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent, Captain James E. Higgins,* and *Captain Monte Engler.*

*Captain Salvatore A. Romano* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant* and *Major Edwin P. Wasinger.*

## Opinion of the Court

DARDEN, Judge:

Charged with the premeditated murder of Sergeant James I. Bell, the appellant was convicted by a general court-martial of unpremeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC 918. His sentence of a dishonorable discharge, total forfeitures, and confinement at hard labor for ten years remains unchanged. The questions on appeal are whether self-defense is raised as an issue and whether the law officer prejudicially erred by instructing the court that if they found Hurt's pretrial statement involuntary his in-court testimony could not be considered for any purpose.

Hurt became the manager of an enlisted men's guesthouse at Fort Dix, New Jersey, during the early months of 1968. Before then he had worked on post at a similar facility for officers. He met the deceased, Mrs. Bell, and their two children sometime in March of 1968. The family had arrived by taxi and unsuccessfully attempted to obtain a room in the guesthouse to await Bell's expected overseas shipment. Hurt was able to accommodate them two days later. The Bells occupied a second floor room in this facility for approximately one month. During this period frequent meetings between the appellant and Mrs. Bell developed into an adulterous relationship. Soon Mrs. Bell complained that she was being beaten by her husband for going out with the appellant, despite her denials of having done so. On more than one occasion Bell's antics in the guesthouse required the intervention of Military Police. Bell threatened to kill the appellant for causing him trouble with the authorities. Hurt informed the court that his life had been threatened by Bell face-to-face or by phone three or four times.

**207**

In early April, Bell, pursued by his wife, had rushed into Hurt's office at the guesthouse and inquired if the appellant loved Mrs. Bell. When Hurt responded in the negative, Bell declared, "Well, you just saved your life." He then added, "I tell you two something right now, if I ever see you within arm's reach of each other, I will kill the both of you." The appellant believed Bell to be serious. Bell, according to the appellant, was "just mean, he was a tough paratrooper." The appellant repeated that he was afraid, as Bell had threatened to kill him, had tried to kill his wife, and had put one MP in the hospital. Once four MPs were needed to remove him from the guesthouse. Bell had the reputation of being mean when drunk, and during this period he was described as being in this condition much of the time.

Responding to prosecution evidence designed to portray him as one who had been the moving force in an unwarranted killing, Hurt described to the court-martial the events of April 18, 1968, the day of the shooting. He related that on that day he had been working under the dashboard of his car then parked behind the guesthouse; that Bell and Specialist Brown appeared; that Brown reached in the open door of Hurt's car and pushed him down whenever he attempted to straighten up; but that Bell and Brown then walked away and entered the guesthouse. Shortly afterward, Mrs. Bell appeared, upset because Sergeant Bell intimated that Hurt had said "bad things" about her. After assuring her that this was untrue, he reminded her of Bell's threats, insisted that she get away from the car, and then hurriedly left the area. Desiring to seek an understanding with Bell, the appellant drove to his quarters, where he secured a .22 caliber revolver. He said he believed that possession of the gun would better enable him to hold off Bell pending arrival of MPs, if the victim tried to carry out earlier threats against the appellant when they met. With the pistol and extra ammunition, Hurt returned to the guesthouse, proceeded up the stairs and down the hall toward the Sergeant's room. Mrs. Bell,

according to the appellant, stood outside the room talking with three or four other women. When he came in view she shouted to her husband, "James, that man, that man is here. Tell him what you told me." Bell rushed out and to the appellant said, "Let's go outside; we'll get this settled once and for all." Leading, Bell reached the first floor, put his hand in his pocket, and walked outside away from the building toward a large ditch. The appellant asked how far they were going. From behind, Brown replied, "You don't ask questions; you just keep walking." The appellant turned and began walking so that he faced both men. One came toward him from the left, the other from the right. Ignoring appellant's request to stop, both continued toward him. He believed that retreat was cut off. When Bell's hand came "out at me," Hurt drew his pistol, yet only Brown stopped. In the words of the appellant, "he [Bell] started running on me." Hurt repeatedly pleaded, "Please stop." When the victim came almost within reach, the appellant closed his eyes and pointed the gun at the oncoming figure. Contrary to assertions made in his pretrial statement, the appellant testified that he remembers nothing other than Mrs. Bell's scream. He recalls walking into the guesthouse with the pistol dangling from his little finger. He did not remember either firing or reloading the weapon.

An instruction on self-defense was given by the law officer in this case. From the record, the parties appear to have agreed that the issue was raised and that the instruction was needed. A unanimous board of review opinion also seems to have reached this same conclusion. We agree.

Hurt defended on the ground that he responded to an unprovoked attack initiated by Bell. We are ■ satisfied that the appellant's testimony, supported partially by that of other witnesses, created an issue of credibility that should have been determined by the triers of fact. United States v Gordon, 14 USCMA 314, 34 CMR 94. For that matter, the appellant's testimony alone

is sufficient to raise the issue of self-defense. United States v Moore, 16 USCMA 375, 36 CMR 531. Medical testimony shows that Bell received multiple wounds in or near the cranial area. Which wound or series of wounds resulted in his death could not be determined with any degree of medical certainty. We are, therefore, unwilling to say that Hurt's extensive use of the weapon vitiated his claim of self-defense; the first shot could have caused death. Cf. United States v Amdahl, 3 USCMA 199, 11 CMR 199. Full and complete instructions on the subject are a "concomitant requirement" when self-defense is raised. Credibility becomes a matter for the triers of fact. United States v Holly, 18 USCMA 413, 40 CMR 125; United States v Thornton, 19 USCMA 140, 41 CMR 140. In this case the law officer commendably satisfied the instructional requirement.

During the course of this trial the prosecution offered into evidence as a prosecution exhibit the pretrial statement given by Hurt to interrogating agents. In it, the appellant recalls reloading the weapon and shooting the victim as he lay on the ground. The voluntariness of this statement was first litigated during an out-of-court session; after the law officer admitted the statement into evidence, its voluntariness was relitigated before the court-martial. As a consequence, before the appellant took the stand to testify on the merits, the law officer initiated an out-of-court discussion regarding the relevancy of United States v Bearchild, 17 USCMA 598, 38 CMR 396. In that case Bearchild's pretrial statement was received into evidence, despite the defense's argument that he had not received proper Article 31 or *Miranda*[1] warning. During the course of the proceeding, however, Bearchild took the witness stand and gave evidence amounting to a judicial confession of involuntary manslaughter by culpable negligence. Before this Court appellate Government counsel conceded the inadequacy of the warning advice

given Bearchild before the taking of his pretrial statement. Relying upon Harrison v United States, 392 US 219, 20 L Ed 2d 1047, 88 S Ct 2008 (1968), this Court held the "fruit of the poison tree" rule applicable to in-court testimony brought about by the admission of an improperly obtained pretrial statement. The *Bearchild* opinion asserts furthermore:

". . . Above and beyond the arraying of evidentiary matter, the Government is called upon to *affirmatively show* 'that its illegal action did not induce his testimony.' Indeed, it must dispel the *inference* that no testimonial utterance would have been made had not prosecution already 'spread the petitioner's confessions before the jury.' (36 U. S. Law Week, at page 4550.) It makes no difference, under such a measurement, that not one scintilla of evidence indicates accused was motivated to testify by the admission of his pretrial revelations or that his trial presentation was no more than a reproduction of what he had earlier revealed to interrogating agents. The simple fact of the matter is that the Government may not satisfy the requirements of *Harrison* by standing on a barren record. Instead they must affirmatively demonstrate the existence of a hiatus—a lack of causal relationship—between that which is illegal and that which would otherwise be tainted thereby." [United States v Bearchild, supra, at page 603.]

After trial defense counsel's assertion that admission of the pretrial statement "compelled" the appellant's appearance on the witness stand, the law officer in this case believed that *Bearchild* required the giving of an instruction to the court that if they found the pretrial statement involuntary the appellant's in-court testimony could not be considered for any purpose. The trial defense counsel vehemently protested that *Bearchild* did not require the inclusion of such an instruction and that it was improper for the law officer to ask why appellant was taking the stand. The counsel expressed willing-

[1] Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966).

ness to accept an instruction that the appellant's in-court testimony could not be used for conviction or, as a last resort, to waive the applicability of *Bearchild* in this case. Nonetheless, the law officer gave the following instructions:

"As a related matter connected with the use you may make of this statement, I advise you that under the circumstances of this case and applying my interpretation of the law as announced by the Court of Military Appeals, if you are not convinced beyond a reasonable doubt that the accused's pretrial statement was voluntary, then his testimony before you in open court is similarly not voluntary and cannot be considered by you for any purpose." [Record, pages 966–977]

After considering this same issue, the board of review decided that the defense raised no substantial issue concerning the voluntariness of the appellant's pretrial statement. That board also concluded that under United States v Gustafson, 17 USCMA 150, 37 CMR 414, defense counsel's waiver of the instruction would have been "knowledgeable, deliberate, and legal." In *Gustafson* the Court determined that an accused could affirmatively consent to the receipt of evidence normally inadmissible because of a defective *Miranda* warning. Here, the appellant informed the court-martial that he had not fully understood the warning advice given him, that he was told he could see his wife after he gave a statement, and that because of his friendship with one of the agents he misunderstood the significance of the pretrial inquiry. Reasonable men might be persuaded that the pretrial statement was involuntary. Cf. United States v Planter, 18 USCMA 469, 40 CMR 181; United States v Gorko, 12 USCMA 624, 31 CMR 210; and United States v Tanner, 14 USCMA 447, 34 CMR 227. Regardless, *Bearchild* was never intended to ■ be construed so as to deprive the appellant of a defense. Appellate defense counsel for Hurt point out that, under the procedure followed in the instant case, the appellant could contest the voluntariness of his pretrial statement or assert a defense at trial, but he could not do both without risking harmful consequences. Neither *Harrison* nor *Bearchild* requires that the accused assume such a risk. Neither imposes a responsibility upon the law officer to give an instruction as he did in this instance. Instructions of this kind should be reserved for those instances in which testimony or declarations are offered against an accused as was the case in *Harrison*. If this were not our holding, a resulting anomaly would be that if the appellant convinced the members of the court-martial that his pretrial statement was involuntary, the members must be instructed that they could not consider his testimony in his favor.

Accordingly, the decision of the board of review is reversed. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

Before the accused went to see Bell he armed himself with a pistol and *extra ammunition*. When he accompanied Bell to the parking lot to "get this settled once and for all" he emptied the pistol into Bell, while Bell was patently unarmed and eight to ten feet from him. Then, when Bell fell to the ground, the accused *reloaded* the pistol and fired several more shots at Bell. At the very least, by accompanying Bell to the parking lot to settle the matter, the accused knew and understood he would engage in mutual combat. In United States v Green, 13 USCMA 545, 550, 33 CMR 77, we said:

"[T]here can be no question that aggressors, *those who engage in mutual combat*, or any who thus precipitate an altercation, are not entitled to self-defense. . . . [T]he law does not permit accused—under the guise of action in self-defense—to arm himself with a dangerous weapon; deliberately seek out his 'antagonist' and renew the encounter; and provoke an altercation with the fore-

seeable consequences that here ensued." [Emphasis supplied.]

In the *Green* case, we held that, although the law officer instructed on self-defense, the issue was not reasonably raised by the evidence; as a result, an error in the instructions was not prejudicial to the accused. In my opinion, this case is not distinguishable from *Green*.

As to the accused's contention that his in-court testimony was coerced by the allegedly erroneous admission in evidence of his pretrial statement, I agree with the law officer. The accused cannot have it two ways, claiming on the one hand that his testimony should not be considered because it was coerced by an erroneous ruling, and insisting on the other that his testimony is truthful and should be considered in determining his guilt or innocence. In my opinion, Harrison v United States, 392 US 219, 20 L Ed 2d 1047, 88 S Ct 2008 (1968), stands for the principle that coerced testimony cannot be accorded judicial consideration in the assessment of the accused's guilt or innocence. In that case, the accused's testimony was presumably truthful, but the Supreme Court held that it could not be accorded judicial consideration because it had been coerced. I find no error in the law officer's instructions.

I would affirm the decision of the board of review.